Filed 10/21/25  P. v. Shales CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B340561 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA107190) |
| v. | |
| BROOKE DOROTHY SHALES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge. Affirmed.

Braunstein & Braunstein, George G. Braunstein, Clark Anthony Braunstein and Annie Berlin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie C. Brenan and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Brooke Dorothy Shales (defendant) appeals from the trial court's postjudgment order for victim restitution pursuant to Penal Code section 1202.4.[1] Defendant contends the court abused its discretion by finding the victim Chad Gunsolly, M.D., has a permanent disability and awarding him loss of future wages. We conclude substantial evidence supports the court's findings for restitution and affirm.

## BACKGROUND

**The automobile accident and arrest**

In August 2022, defendant rear-ended a parked vehicle while driving intoxicated at a high rate of speed. Defendant immediately left the scene of the collision without providing any personal information. Shortly afterwards, defendant collided head-on with the rental car driven by Gunsolly who was with his family on vacation. First responders arrived and rendered aid to the victims and defendant. Officers observed defendant showed symptoms of being under the influence, administered a field sobriety test, and placed her under arrest. Defendant's blood alcohol level was between 0.18 and 0.19 percent. Defendant had three prior driving under the influence of alcohol (DUI) convictions.

**The charges and sentencing**

In September 2022, defendant was charged in a felony complaint with hit-and-run driving resulting in injury to another person (Veh. Code, § 20001, subd. (b)(1); count 1), DUI causing injury (Veh. Code, § 23153, subd. (a); count 2), and driving with a 0.08 percent blood alcohol content causing injury (Veh. Code,

---

[1]    All undesignated statutory references are to the Penal Code.

§ 23153, subd. (b); count 3). There were further allegations defendant was subject to additional punishment because she proximately caused bodily injury to more than one victim (Veh. Code, § 23558) and had a blood alcohol concentration of 0.15 percent or more (Veh. Code, § 23578).

Defendant initially pled not guilty to all of the charges. Later she reached a plea agreement wherein she withdrew her not guilty plea on count 3 and pled no contest, while the other two counts were dismissed pursuant to section 1385. Imposition of sentence was suspended and defendant was placed on formal probation for three years. Defendant was fined and ordered to pay restitution to the victim, pursuant to section 1202.4, subdivision (f). Gunsolly requested $1,137,660 in restitution. This amount was based on his projected lost earnings over the next 20 years due to the injuries he suffered in the accident resulting in his inability to work as an emergency room surgeon.

 **The restitution hearing**

A multiday restitution hearing was held beginning on January 5, 2024, during which Gunsolly testified that he sustained tendon tears to his dominant hand due to the automobile collision. Gunsolly's doctors initially recommended conservative treatment, such as splinting, ice, physical therapy, and pain medication, but he continued to experience pain in his wrist and could not extend, rotate, or move it properly. After many months, Gunsolly's doctors recommended an exploratory arthroscopy, which he did on December 7, 2023. The procedure revealed synovitis in his wrist. A complete synovectomy was performed whereby the fluid-producing synovium was surgically removed.

After the surgery, however, Gunsolly still had functional limitations in his dominant hand. While the pain improved, he

could not extend his hand, rotate it properly, or "load weight" with it. Gunsolly testified that having weight in his hand caused the bone in his wrist to move out of alignment, which required him to pop his wrist back in place, causing additional pain and had increasingly become difficult to accomplish. Gunsolly explained the severe pain and discomfort limited him from performing nearly all of the mechanics in patient treatment in an emergency room, causing the loss of clearance to return to emergency medicine. Gunsolly believed his injuries were permanent because his limited extension had not improved despite doing everything he could to improve the function of his hand.

Further, Gunsolly testified regarding his lost wages, estimating losses from the collision, including offsetting insurance disability payments, amounted to $56,883 per year. These economic losses were due to Gunsolly having to transition from emergency to internal medicine. Gunsolly projected total financial losses, including money he expected to earn in overtime, to be $1,137,660 over the next 20 years.

In addition, Gunsolly addressed the opinion of Kenneth R. Sabbag, M.D., a defense expert, who concluded Gunsolly should take a steroid injection and that his refusal to do so was unreasonable. Gunsolly testified his refusal was not unreasonable because steroid injections posed the risk of infection, bleeding, further tendinopathy, and even tendon rupture, which could cause catastrophic complications. Gunsolly acknowledged an MRI of his wrist taken in May 2023 showed the tendon tear in his hand had healed. But he testified he never regained his prior functional capacity, which his doctor said would never return.

Defendant asserted Gunsolly was requested to undergo an independent medical examination (IME) to evaluate his injury, but he refused to attend. Gunsolly claimed the location of the IME was 75 miles from his residence. As defendant could not find anyone else to perform the examination, the IME was never performed. Further, defendant presented Dr. Eon Shin's May 3, 2023, report that found "[n]o evidence of tendinosis, tendon tear or tenosynovitis." However the report indicated tendinosis was found on a different part of Gunsolly's wrist.

In addition, defendant presented Dr. Sabbag's December 12, 2023 report that found it was "not reasonable [for Gunsolly] to avoid a corticosteroid injection for fear of infection. The infection rate for an injection at this level is remarkably low." Defendant maintained Gunsolly could not say within a degree of credibility whether the steroid injection would have reduced his inflammation and allowed him to perform emergency room procedures because he never took the steroid.

On April 5, 2024, defendant filed a written opposition to the request for restitution. On May 14, 2024, the People filed a restitution memorandum requesting $1,997,681 for future lost wages. Defendant responded by filing a memorandum of points and authorities on the issue of restitution. In this memorandum, defendant argued the prosecution, in relying exclusively on Gunsolly's self-serving statements, had presented no factual basis to show he is permanently disabled. Defendant maintained Gunsolly was not entitled to loss of future earnings, and his calculations of lost wages were grossly oversimplified and inflated.

The restitution hearing resumed on May 20 and 21, 2024, during which the trial court heard additional testimony from Gunsolly and accepted exhibits from both sides. Gunsolly was

called back to testify on redirect on how his inability to practice emergency medicine impacted his expected future wages. The court immediately made oral findings after the parties finished presenting evidence.

**The trial court's findings and order**

The trial court found Gunsolly was an "extremely credible" witness and the People showed he has a permanent disability despite a lack of another doctor's report classifying him as such. The court observed Gunsolly brought "his own training and his own expertise in education as a foundation for his description of his . . . impairments." The court was convinced no one would ever again hire Gunsolly for emergency room work based on his statements in the proceedings. The court determined Gunsolly's testimony alone provided substantial evidence of his permanent disability and lost wages and shifted the burden to the defense.

The trial court also found the defense did not rebut Gunsolly's testimony because they failed to show he was required to undergo the treatment recommended in Dr. Sabbag's expert opinion. Further, in response to defendant's argument that Gunsolly should not be compensated for 20 years, the court indicated Gunsolly testified on record he could no longer perform emergency medicine. The court concluded this effectively ended his career in the field because he would not be insured or hired to do that work. The matter was taken under submission at the conclusion of the hearing.

In its July 3, 2024 ruling, the trial court awarded Gunsolly a total of $985,270.33 in restitution based on the parties' stipulated amount of $19,360.33, plus $965,910 in past and future economic losses sustained due to the accident. The court noted several aggravating circumstances. First, defendant had been convicted of DUI on three prior occasions. In addition, the

6

subject incident involved two separate collisions. Further, the probation officer recommended a state prison sentence because probation had not deterred defendant, and she had proven herself to be a perpetual threat to the community. The court also noted Gunsolly's children suffered ongoing trauma despite Gunsolly's wife, who was also a physician, recognizing it could have been far worse for them as they suffered no permanent disability. Finally, defendant was placed on formal felony probation due to her actions in this matter. Defendant agreed to take prescription medication and enter a treatment center for mental health and substance abuse.

The trial court then noted some possible mitigating factors in this case. The court indicated defendant was diagnosed after the accident with alcohol use disorder, alcohol-induced bipolar and related disorder, posttraumatic stress syndrome, and schizoaffective disorder, depressive type.

The trial court explained the power to order restitution is broader in probation cases, citing *People v. Martinez* (2017) 2 Cal.5th 1093. The court also made oral findings regarding Gunsolly's credibility and his permanent disability, noting Gunsolly needed his dominant hand to be unimpaired in order to provide competent emergency treatment in a hospital setting. The court reiterated a hospital emergency room would not employ Gunsolly based on the testimony he provided and continuous liability concerns.

The trial court ordered victim restitution for loss of earnings and future loss of earnings, offset by Gunsolly's ability to earn money as an internal medicine doctor and to teach medicine going forward. The court found the increased hours Gunsolly was required to work to earn less money following the collision were not economic losses recoverable under section

1202.4, subdivision (f), because a victim restitution hearing in a criminal case is not a substitute for civil litigation. The court found Gunsolly had the capacity to work until his retirement and that changes to his quality of life were more suitably addressed under civil tort law. The court declined to discount the restitution order to its present value because no evidence was introduced on the matter.

The trial court considered additional filings on August 29, 2024, and entered the restitution order the same day. Defendant timely appealed.

## CONTENTIONS ON APPEAL

Defendant asserts two main arguments. First, defendant contends the trial court abused its discretion in finding Gunsolly has a permanent disability because there is no substantial evidence supporting the finding. Defendant argues the court improperly relied solely on Gunsolly's testimony, which was self-serving and not supported by any corroborating medical records or expert testimony. Second, defendant asserts the court erred in awarding Gunsolly loss of future wages because there was insufficient evidence of a causal connection between defendant's conduct and Gunsolly's alleged losses. Defendant maintains there were no medical reports linking Gunsolly's condition to the accident. Defendant posits the court's award was speculative because there was no evidence Gunsolly would have continued practicing emergency medicine for the duration of his career.

## DISCUSSION

### I.    Standard of review

"On appeal, we review a restitution award for abuse of discretion." (*People v. Jessee* (2013) 222 Cal.App.4th 501, 507.)

8

"The award must be supported by sufficient evidence under the substantial evidence standard of review." (*Ibid*.) "In reviewing the sufficiency of the evidence, the "'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings.'" (*People v. Baker* (2005) 126 Cal.App.4th 463, 468–469 (*Baker*).) "'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding." (*Id*. at p. 469.) "We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact." (*Ibid*.)

"A victim's restitution right is to be broadly and liberally construed." (*People v. Mearns* (2002) 97 Cal.App.4th 493, 500.) "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." (*People v. Dalvito* (1997) 56 Cal.App.4th 557, 562.)

## II. Substantial evidence supports the trial court's findings

### A. *Permanent disability*

Defendant contends the trial court abused its discretion in finding Gunsolly has a permanent disability because the evidence was insufficient to support the finding. Defendant argues other medical evidence refuted Gunsolly's claim of permanent impairment. Defendant maintains the court could not rely solely on Gunsolly's testimony without the support of other medical record or expert testimony. We disagree.

Under section 1202.4, subdivision (f), "in every case in which a victim has suffered economic loss as a result of the

defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." "It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) "[T]he restitution order . . . shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).)

"[T]he scope of a trial court's discretion is broader when restitution is imposed as a condition of probation." (*People v. Giordano* (2007) 42 Cal.4th 644, 663, fn. 7.) Under section 1203.1, a court has broad discretion to impose probation conditions, which should be upheld unless they have no relationship to the crime of conviction, relate to noncriminal conduct, and require conduct not reasonably related to future criminality. (*Giordano, supra*, at p. 663, fn. 7.) "California courts have long interpreted the trial courts' discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.) "There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." (*Ibid*.) "'"'[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider'"'" in

10

determining victim restitution." (*People v. Phu* (2009) 179 Cal.App.4th 280, 283 (*Phu*).)

We conclude substantial evidence supports the trial court's finding the victim Gunsolly has a permanent disability and can no longer practice emergency medicine. Gunsolly testified in a multiday hearing in which he explained the tendon tears to his dominant hand due to the automobile collision. He indicated his initial MRI showed subluxation of his ulna—his wrist moved out of place. Gunsolly attested he received all of the conservative treatments his doctors initially recommended, such as splinting, ice, physical therapy, and pain medication. However, Gunsolly stated he continued to experience pain in his wrist and could not extend, rotate, or move it properly.

Gunsolly attested he obtained an exploratory arthroscopy on December 7, 2023, as his doctors recommended, and the procedure revealed synovitis in his wrist. He needed a complete synovectomy in which the fluid-producing synovium was surgically removed from his wrist. Gunsolly testified he still had functional limitations in his dominant hand after the surgery, though the pain improved. He still could not extend his hand, rotate it properly, or "load weight" with it. Gunsolly further explained that putting weight in his hand caused the bone in his wrist to move out of alignment, requiring him to pop his wrist back in place, which caused additional pain and had increasingly become more difficult to accomplish. Gunsolly attested this severe pain and discomfort restricted him from nearly all emergency room procedures, such as injectives, changing chest tubes, performing intubations, lumbar punctures, and inserting central lines. Gunsolly stated he lost clearance to return to emergency medicine.

11

Gunsolly acknowledged an MRI taken in May 2023 showed the tendon tear in his hand healed, but he explained he never regained his prior functional capacity, and his doctor said it would never be the same again. Gunsolly testified he believed his injuries were permanent because he did everything he could to aid the function of his hand, but his limited extension had not improved.

Gunsolly's testimony was detailed and included his own expertise in explaining the nature of the functional limitations in his hand. The trial court found Gunsolly "extremely credible" and observed he brought "his own training and his own expertise in education as a foundation for his description of his . . . impairments." The court was aware it was relying primarily on Gunsolly's testimony, noting one should not wrongfully assume medical doctors are necessarily reliable or credible people. The court reached its conclusion regarding Gunsolly's credibility because the "witness, in [its] opinion, was extremely reliable in terms of his basis for the information that he provided to the court, extremely sincere, genuine, honest. There was no example of over reaching [*sic*]."

Further, in addressing the defense's argument that Gunsolly's testimony was self-serving and no other doctor's report had classified him with a permanent disability, the court stated it was convinced Gunsolly would never be hired again for emergency room work based on his testimony in the proceedings. The court added there was now a record with Gunsolly's statements he could no longer perform emergency medicine. The court concluded Gunsolly could never return to emergency medicine even if he wanted to because no one would insure or hire him to do that work given his testimony on his injury.

The foregoing statements of the court do not show the trial court was "irrational" and acted without factual basis in reaching its findings. The court carefully assessed the substance of Gunsolly's testimony, evaluated his credibility, and considered defendant's opposing arguments. The court ultimately found Gunsolly's testimony was more compelling than the evidence offered by the defense, finding defendant's experts and evidence, while credible, were insufficient to rebut Gunsolly's testimony.

Defendant contends the trial court improperly relied solely on Gunsolly's testimony and disregarded overwhelming contradictory medical evidence. In asserting there is no factual or rational basis for the restitution order, the defense argues they are not asking this court to weigh evidence. On the contrary, reweighing evidence is precisely what the defense is requesting this court to do. "When the exercise of the court's discretion depends on how it resolves questions of fact, we must defer to the court's "'credibility determinations and findings on questions of historical fact if supported by substantial evidence.'"" (*Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 817.) And as discussed above, in reviewing the sufficiency of the evidence, we assess whether there is *any* substantial evidence, *contradicted* or uncontradicted, supporting the trial court's findings. (*Baker, supra*, 126 Cal.App.4th at pp. 468–469.) Moreover, the court has "'"virtually unlimited discretion"'" as to the kind of information it can consider in determining victim restitution. (*Phu, supra*, 179 Cal.App.4th at p. 283.)

Defendant essentially asserts here that Gunsolly's testimony should be given little weight because it is not corroborated by other medical reports and the defense has offered

expert opinions and reports refuting the testimony.[2] Defendant highlights Dr. Shin's May 3, 2023, report that found "[n]o evidence of tendinosis, tendon tear or tenosynovitis." Gunsolly testified his functional limitations remained despite the tendon healing. Furthermore Gunsolly indicated he lost clearance to return to an emergency room and his limited extension had not increased despite treatments to improve the function of his hand.

Defendant also maintains Dr. Sabbag's December 12, 2023 report shows it was "not reasonable [for Gunsolly] to avoid a corticosteroid injection for fear of infection. The infection rate for an injection at this level is remarkably low." But Gunsolly testified he disagreed with Dr. Sabbag's opinion, explaining the steroid injections posed a risk of infection, bleeding, further tendinopathy, and even tendon rupture. Gunsolly testified these complications would be catastrophic and would further alter his life and career. Nothing shows Gunsolly was required to take the steroid injections as Dr. Sabbag recommended. Even assuming arguendo Gunsolly had a duty to mitigate damages, his

---

[2] The defense cites Evidence Code section 412 in support of their argument the trial court should have given Gunsolly's testimony little weight. Evidence Code section 412 states: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." "The witness's testimony *may* be viewed "'with distrust'" under the statute." (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 363, italics added.) Thus, this provision does not require the court to assign certain weight to Gunsolly's testimony. At the hearing, the court addressed any distrust in Gunsolly's testimony and ultimately found him very credible. Nothing shows the court was prohibited from making such findings under Evidence Code section 412.

14

testimony demonstrates he acted reasonably in declining to take the steroid injections given the risks involved.[3]

In short, the defense has only provided their own interpretations and contentions regarding the evidence in this matter.[4] Assessing the credibility of witnesses and weighing the evidence, however, are the province of the trial court. The court's evaluations of Gunsolly's credibility and how the evidence should be weighted are entitled to deference. There is no evidence the court abused its discretion in finding Gunsolly has a permanent disability and is entitled to restitution.

### B. *Award of loss of future wages*

Defendant posits the trial court erred in awarding loss of future wages because the evidence is insufficient to show the accident caused Gunsolly's current physical limitations and transition to internal medicine.

"[S]ection 1202.4, subdivision (f)(3) provides that '[t]o the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred *as the result of the*

---

[3] In addition, the defense argues they requested Gunsolly to undergo an IME to evaluate the alleged permanent injury, but he refused to attend because it was too far from his residence. While this factor could be weighed against Gunsolly, the trial court concluded he was a credible witness. Defendant fails to show the court abused its discretion by making this finding.

[4] Defendant also claims the trial court had an improper punitive intent underlying its restitution order because it expressed dissatisfaction with defendant's sentence. However, the defense provides no evidence linking the court's views on defendant's sentence to its findings in the restitution order. Accordingly, defendant's assertion is speculative and unsupported.

*defendant's criminal conduct . . . .'"* (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320–1321 (*Holmberg*).) Tort principles of causation apply in awarding victim restitution in criminal cases. (*People v. Jones* (2010) 187 Cal.App.4th 418, 425.) "[T]here 'are two aspects of causation . . . : cause in fact (also called direct or actual causation), and proximate cause.'" (*Holmberg, supra*, at p. 1321.) "'An act is a cause in fact if it is a necessary antecedent of an event,'" while "'proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct."'" (*Jones, supra*, at p. 425.)

In determining cause in fact, ""[t]he 'but for' rule has traditionally been applied to determine cause in fact."'" (*Holmberg*, *supra*, 195 Cal.App.4th at p. 1321.) In assessing proximate causation, "California courts have adopted the 'substantial factor' test in analyzing proximate cause. [Citation.] "'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." [Citation.] Thus, "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor" [citation], but a very minor force that does cause harm is a substantial factor [citation]. This rule honors the principle of comparative fault.'" (*Id.* at pp. 1321–1322.)

The trial court's award of future wages is supported by substantial evidence of causation. Gunsolly testified he sustained tendon tears to his dominant hand, a subluxation of his ulna, as a result of the traffic collision. This injury was confirmed in his initial MRI. Gunsolly received the conservative treatments recommended by his doctors, but his physical limitations remained. Gunsolly then had a complete synovectomy after an

16

exploratory arthroscopy revealed synovitis in his wrist. Still Gunsolly had functional limitations in his hand and lost clearance to resume practicing emergency medicine. No evidence was presented demonstrating Gunsolly's injury resulted from a preexisting condition or other injury. Accordingly, it can be reasonably inferred the automobile collision actually and proximately caused Gunsolly's injury as his problems manifested shortly after the incident and defendant's conduct played more than an "infinitesimal" or "theoretical" part in bringing about the injury.[5]

In opposing the award of loss of future wages, the defense once again offers only their interpretations and contentions as to the evidence regarding causation. Defendant asserts there is no medical diagnosis linking Gunsolly's injury to the accident, and an MRI arthrogram revealing tendinosis in a different part of Gunsolly's wrist, as well as his concession his tendon tear has healed, significantly weaken Gunsolly's claim of permanent impairment. Defendant also maintains Gunsolly's refusal to take the corticosteroid injections recommended by Dr. Sabbag broke the chain of causation.

Defendant's assertions conflate evidence challenging Gunsolly's testimony with a lack of substantial evidence. As

---

[5] The People argue section 1202.4, subdivision (f)(4)(A), sets forth a presumption that a victim's loss directly resulted from the defendant's criminal conduct. However, this presumption only applies "[i]f, as a result of the defendant's conduct, the Restitution Fund has provided assistance to or on behalf of a victim or derivative victim . . . ." (§ 1202.4, subd. (f)(4)(A).) Nothing has been shown concerning the Restitution Fund in this matter. Regardless, there is substantial evidence Gunsolly's loss resulted from defendant's criminal conduct as discussed herein.

discussed earlier, the trial court found Gunsolly "extremely credible" as he brought his own expertise in discussing his injury in detail and did not overreach. The sufficiency of the evidence standard requires this court to determine if there is *any* substantial evidence, *contradicted* or uncontradicted. (*Baker, supra*, 126 Cal.App.4th at pp. 468–469.) The court carefully evaluated Gunsolly's credibility and gave his testimony greater weight than defendant's evidence. Further, nothing shows Gunsolly had a duty to mitigate damages, but he nevertheless provided testimony showing he reasonably declined to take the steroid injections recommended by Dr. Sabbag due to significant risks involved. Thus, there is substantial evidence of causation supporting the court's award of loss of future wages.

Finally, defendant maintains the trial court erred in calculating its award because it was speculative Gunsolly would have continued practicing emergency medicine for the duration of his career. But "[d]etermining causation always requires evaluation of hypothetical situations concerning what might have happened, but did not." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1242.) "This is so because the very idea of causation necessarily involves comparing historical events to a hypothetical alternative." (*Ibid*.) "While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 992.)

Gunsolly testified he trained very hard for and loved emergency medicine. He was hopeful he could return to the practice of emergency medicine. He also explained his pay for emergency medicine was better than the pay for internal medicine, which required additional hours of work to earn less.

The trial court found Gunsolly credibly testified to his preference for emergency medicine. Thus, providing substantial evidence to support the finding Gunsolly would have practiced emergency medicine for the remainder of his career. The court therefore did not abuse its discretion as its method of determining the award was rational, rather than arbitrary or capricious, and could reasonably be said to make the victim whole.

## DISPOSITION

The August 29, 2024 order for victim restitution is affirmed.

CHAVEZ, J.

We concur:

LUI, P. J.

RICHARDSON, J.